J-S64014-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.M.B., JR. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.N.B., NATURAL | : | |
| MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1017 WDA 2019 |

Appeal from the Order Entered May 30, 2019
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  151 of 2018

BEFORE:   BOWES, J., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                **FILED JANUARY 10, 2020**

T.N.B. ("Mother") appeals from the May 30, 2019 orphans' court order that involuntarily terminated her parental rights to her minor daughter, T.M.B., Jr.,[1].  We affirm.

T.M.B. was born in April 2015.  She has epilepsy, cognitive delays, and a genetic disorder that may cause defects in her spine and neurological system.  T.M.B. has been in the custody of Westmoreland County Children's Bureau ("WCCB") since October 2017.  N.T., 5/30/19, at 63, 76.  The trial court recounted the following circumstances leading to her placement:

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] T.M.B., Jr., is a female child, who does not share the initials of either Mother or Q.M. ("Father").  For ease of reference, we will refer to T.M.B., Jr., solely as T.M.B.  By separate order entered on May 30, 2019, the orphans' court involuntarily terminated the parental rights of Father, who did not appeal.

On or about October 5, 2017, a referral was received by [WCCB] that Mother was in the emergency room for the sixth time since August. Mother fell asleep and [T.M.B.] was running around the emergency room climbing on other patients. There were concerns for a lack of supervision of the minor child and homelessness for Mother, as she had multiple bags with her and had spent the night in the emergency room even though she had been discharged . . .

[T]he caseworker assigned to the case, Brenda Harr, attempted to meet with Mother but was unsuccessful. On or about October 13, 2017, Mother arrived at the agency stating that [Father] had [T.M.B.] and would not give [T.M.B.] back to Mother. . . . The agency requested emergency custody of [T.M.B.] as they were uncertain about paternity and had ongoing concerns for Mother's untreated mental health and homelessness, as well as a lack of supervision and the lack of proper medical and dental care for [T.M.B.]

. . . .

[O]n or about October 13, 2017, a Shelter Care hearing was held before the undersigned Juvenile Court Hearing Officer, at which time [T.M.B.] was retained in agency custody.

[A] Petition for Dependency was filed by the [WCCB] on October 17, 2017, alleging that [T.M.B.] is without proper parental care and control. The Petition for Dependency alleged that the family has a history of involvement with the [WCCB and] . . . the Allegheny County Children and Youth agency[.] . . . Mother has severe mental health concerns[, and] has had parental rights involuntarily terminated in the past to two older children[.]

*See* Order, Findings of Fact, 11/14/17, at 1-2. Since October 2017, T.M.B.

has resided in pre-adoptive kinship placement with T.D. and K.D., the adoptive

parents of T.M.B.'s two older half-siblings. *Id*.

T.M.B. was adjudicated dependent on November 14, 2017. In order to

be reunified with T.M.B., Mother was ordered to comply with random drug

screens and testing, undergo a psychiatric evaluation and comply with any

recommended treatment, participate in parenting instruction to successful completion, participate in life skills instruction, including home maintenance and budgeting, and maintain stable and appropriate housing in a safe and clean manner. *Id*.

During a June 2018 permanency review hearing, Mother was found to be in moderate compliance with her permanency plan. Order, 6/27/18, at 1. She obtained stable housing for a period of four months and attended visitations with T.M.B. regularly. *Id*. However, during the visitations, Mother did not apply what she had been taught in parenting classes. *Id*. Mother also completed a psychiatric evaluation and was compliant with treatment, but she still displayed concerning behavior with regard to her mental health. *Id*. She made no progress toward alleviating the circumstances necessitating T.M.B.'s placement or parenting, and she demonstrated limited ability, insight, and motivation to retain the information discussed. *Id*. Mother did not accept directives and became hostile when directed. *Id*. While Mother was compliant with mental health treatment, she had a history of taking herself off of her medication and exhibiting symptoms of schizophrenia. *Id*.

On November 30, 2018, WCCB filed a petition to terminate Mother's parental rights, pursuant to 23 Pa.C.S. § 2511(a)(5), (8), and (b). At the ensuing hearing, Mother testified, and WCCB presented the testimony of Deanna Pulice, a parenting specialist, Melissa Husenits, an applied behavioral specialist for adults with disabilities, Joe Narduzzi, a licensed social worker who provided practical parenting training, and Brandi Schweizer, the

treatment caseworker assigned to T.M.B.[2]   The orphans' court terminated

Mother's parental rights on May 30, 2019.  Mother timely filed a notice of

appeal.

Mother complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise

statement of errors complained of on appeal concomitant with her notice of

appeal.  She raises the following issue for our review: "Whether the trial court

erred in finding by clear and convincing evidence that the Westmoreland

County Children's Bureau met its burden . . . under 23 Pa.C.S. § 2511(b)?"

Mother's brief at 4.

We review cases involving the termination of parental rights according

to the following standard:

> The standard of review in termination of parental rights cases
> requires appellate courts to accept the findings of fact and
> credibility determinations of the trial court if they are supported
> by the record.  If the factual findings are supported, appellate
> courts review to determine if the trial court made an error of law
> or abused its discretion.  A decision may be reversed for an abuse
> of discretion only upon demonstration of manifest
> unreasonableness, partiality, prejudice, bias, or ill-will.  The trial

---

[2] T.M.B.'s legal interest and her best interests were represented during these proceedings by Rochelle Bosak, Esquire.  Attorney Bosack testified that she spoke with then-four-year-old T.M.B. and did not discern a conflict between T.M.B.'s best and legal interests.  N.T., 5/30/19, at 3.  Attorney Bosack further testified that T.M.B. had a speech impediment and learning disability, and that she was not able to articulate her preference.  *Id*.  Accordingly, this case complies with our Supreme Court's mandate announced in ***In re Adoption of L.B.M.***, 161 A.3d 172, 174-75, 180 (Pa. 2017) and ***In re T.S.***, 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018), that children in contested termination of parental rights proceedings must be appointed counsel to represent their legal interest.

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

At the outset, we note that since Mother did not challenge the orphans' court's determination pursuant to § 2511(a) we do not address that portion of its decision. Instead, we review Mother's argument that the orphans' court did not adequately examine the bond that she shares with T.M.B. Mother's brief at 9. The relevant subsection of 23 Pa.C.S. § 2511 provides:

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511 (b).

In reviewing the orphans' court's § 2511(b) determination we examine the analysis concerning "whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010). The court is not required to use expert testimony, and social workers and caseworkers

may offer evaluations as well.  ***Id***.  Ultimately, the concern is the needs and welfare of a child.  ***Id***.

> We have noted
>
> > [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension.  Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful.  The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

***Id***. at 1121 (quoting ***In re C.S.***, 761 A.2d 1197, 1202 (Pa.Super. 2000)).

As noted, Mother challenges the sufficiency of the orphans court's needs and welfare analysis pursuant to § 2511(b).  Mother's brief at 10-11.  In support of her argument, she highlights the two years of care that she provided T.M.B. before WCCB placed her in kinship care, and she references two aspects of the evidence that WCCB adduced during the hearing: (1) the parenting specialist's allegedly contradictory testimony that Mother both failed to show affection toward T.M.B. and also engaged with the child during the visitations;  and (2) the parenting trainer's testimony that Mother's interactions with T.M.B. during mealtime had improved.  The gravamen of her position is, "Giving [sic] the testimony in this matter, an adequate analysis should have been made to determine whether terminating Mother's parental rights would destroy an existing, necessary and beneficial relationship." ***Id***. She concludes, that WCCB "has not met its burden with regard to 2511(b) and

Mother's parental rights should not be terminated." *Id* at 10. Mother's argument fails for at least two reasons.

First, to the extent that Mother asserts that the trial court was required to order a formal bonding evaluation, that proposition is undeniably wrong. In actuality, bond evaluations are not required by statute or precedent. ***In re J.N.M.***, 177 A.3d 937, 944 (Pa.Super. 2018). Indeed, as outlined *supra*, the orphans' court may rely upon the relevant observations and assessments of the caseworkers and social workers who are familiar with the details of the case. ***See In re Z.P.***, ***supra*** at 1121. Second and more importantly, the certified record supports the orphans' court's determination that terminating Mother's parental rights best served the developmental, physical and emotional needs and welfare of T.M.B.

Joe Narduzzi, the licensed social worker who performed parenting training, assisted Mother during her supervised visitations with T.M.B. He noted that during the first visit, three-year-old T.M.B. had difficulty separating from her foster mother and cried in her stroller for the length of the visit. N.T., 5/30/19, at 33-34. Mother was not attentive, and she spent most of the visit looking at her phone or walking around the room looking at things. *Id*. at 34.

In addition, Mother struggled with feeding T.M.B. appropriately. At first, she brought only junk food to the visits and argued with Mr. Narduzzi when he suggested bringing microwaveable macaroni and cheese as a more nutritional option that T.M.B. could chew. *Id*. at 39. When Mr. Narduzzi

attempted to assist Mother, she would reply, "I know what my daughter needs, and I know what is best for my daughter." *Id*. at 40.

Mother also showed little interest in learning how to care for T.M.B.'s seizure disorder or other special needs, and was resistant to any parenting instruction. *Id*. at 38-39, 46. With regard to T.M.B.'s seizures, foster mother provided Mother and Mr. Narduzzi with a specialized "seizure bag," containing blankets and supplies, as well as an instruction card describing what to expect and what to do during seizures; however, Mother ignored the instructions. *Id*. at 38-39. At the end of the visit, Mother left the card on the table and refused to take it with her. *Id*. at 39.

Mr. Narduzzi further explained how Mother's slow progress toward interacting with T.M.B. affected the child negatively. *Id*. at 39. While T.M.B. looks forward to their shared meal, Mother is not capable of interacting at length with T.M.B. after the meal. *Id*. at 43. After a year and a half of continual prompting, Mother increased the time she interacts with T.M.B, but she still has inappropriate conversations with T.M.B., including calling Father "no good," and more than once accused foster parents of not appropriately caring for T.M.B., and abusing her. *Id*. at 44. Mr. Narduzzi still did not feel that Mother was capable of interacting with her daughter without supervision. *Id*. at 39, 55.

Mr. Narduzzi continued that WCCB decreased the frequency of the visitations in May 2018 due to Mother's lack of involvement. He explained, at times, Mother wanted to leave early, and on other occasions, Mother sat at

the table without participation, or closed her eyes and fell asleep. *Id*. at 47-48. Accordingly, the visitations were decreased to once a week, which Mother conceded was a good idea. *Id*. She did not request to increase the frequency of the visitation until March 2019, and her request was denied because the petition to involuntarily terminate her parental rights had already been filed. *Id*.

In sum, Mr. Narduzzi testified that the visits between Mother and T.M.B. were more like "play dates" than parent-child visits, and that T.M.B. considered her kinship foster home to be her actual home. *Id*. at 53. T.M.B. did not have any difficulty separating from Mother at the end of visits and often needed to be reminded to say goodbye. *Id*. Mr. Narduzzi was unsure whether Mother had the capacity to be affectionate to T.M.B. due to her cognitive limitations and mental health issues, and this issue would continue to interfere with the development of bonding and attachment. *Id*. at 60. Mother had shown some improvement in her interactions with T.M.B. but it was minuscule improvement. *Id*. While it was clear that Mother loved T.M.B., Mr. Narduzzi believed it was in T.M.B.'s best interest to be adopted. *Id*. at 56.

Similarly, as it relates to T.M.B.'s bond with her kinship family, Richelle O'Malley, who performed a parenting capacity evaluation of Father,[3] testified

---

[3] While Ms. O'Malley did not evaluate Mother's parenting capacity, her testimony helps inform T.M.B.'s needs and welfare, and describes the relationships that T.M.B. shares with her foster family.

that T.M.B. had special needs, including cognitive and speech delays. *Id*. T.M.B. was being evaluated for a genetic disease and was diagnosed with epilepsy. *Id*. Ms. O'Malley stressed that T.M.B. had a strong attachment to her adult foster sister, M.D., who served a maternal function. *Id*. at 13. As an example of their bond, Ms. O'Malley described how T.M.B. typically asked for M.D. during visitation, looked for her when she was ready to leave, and ran into M.D.'s arms when she saw her. *Id*. T.M.B. also appeared comfortable with her foster mother and would go to her without concern. *Id*. Ms. O'Malley opined that termination would be in T.M.B.'s best interest because she had been removed from the home for a significant period of time, and had specialized needs that the foster family was meeting, including special education and medical care. *Id*. at 13-14.

Similar to Ms. O'Malley, Brandi Schweizer, the treatment caseworker assigned to T.M.B., believed that it was in T.M.B.'s best interests to terminate Mother's parental rights because termination would allow T.M.B. to achieve permanency and stability in her foster home where her basic needs, safety, and specialized developmental needs were being met. *Id*. at 70-72. She noted that T.M.B. is thriving in a pre-adoptive foster home with her foster parents, two biological half-siblings, and an adult foster sister to whom she has an extraordinarily close bond. *Id*. at 73, 77. She continued that T.M.B. has dental needs, cognitive delays, seizures, and a genetic disorder that requires close monitoring because it can lead to "tumors on the spine and just issues in the brain." *Id*. at 74. Foster parents have cared appropriately for

every one of T.M.B.'s issues, and T.M.B. views them as her parents. *Id*. at 74-75. While T.M.B. knows Mother, she does not seek Mother out to have her basic needs met. *Id*. In Ms. Schweizer's observation, there was no significant relationship at all between Mother and T.M.B. *Id*. at 75. For example, she supervised three visits between Mother and T.M.B., and watched Mother and T.M.B talk, sit at the table, and eat meals together, but did not discern any affection between them. *Id*. at 65. Hence, Ms. Schweizer did not believe that termination would lead to the termination of a necessary and beneficial relationship for T.M.B. *Id*.

The forgoing evidence belies Mother's assertion that the orphans' court's analysis was deficient. Although it is true that Mother cared for T.M.B. for two years prior to T.M.B.'s placement, and that Mother would occasionally play with T.M.B. during the supervised visitations, these facts do not establish evidence of a beneficial parent-child bond. Rather, the certified record demonstrates that Mother's interactions with T.M.B. were similar to playmates, and that neither Mother nor T.M.B. showed affection towards each other during the visits. Indeed, T.M.B. did not even remember to say goodbye to Mother at the conclusion of the visits without prompting. Importantly, Mr. Narduzzi testified that Mother's cognitive limitations would continue to interfere with the development of the parent-child bond, and Ms. Schweizer testified that there was no significant relationship between Mother and T.M.B.

The preceding facts demonstrate that T.M.B. is a vulnerable child with special needs whose care Mother is incapable of providing. T.M.B. has

developed necessary and beneficial bonds with her pre-adoptive kinship foster family, including two half-sisters, who care for all of her physical, emotional, and medical needs. Accordingly, we affirm the orphans' court's determination that WCCB proved by clear and convincing evidence that the termination of Mother's parental rights satisfied T.M.B.'s needs and welfare pursuant to § 2511(b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/10/2020